1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

11 | MARC A. KELLEY,

12 |         Petitioner,

13 |     v.

14 | CARL WOFFORD, Warden,

15 |         Respondent.

16

17

Case No.  1:13-cv-01313-SAB-HC

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT AND TERMINATE CASE

ORDER DECLINING ISSUANCE OF CERTIFICATE OF APPEALABILITY

18      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

19 pursuant to 28 U.S.C. §2254.  The parties have consented to the exercise of Magistrate Judge

20 jurisdiction pursuant to 28 U.S.C. § 636(c).

21                                              **I.**

22                                       **BACKGROUND**

23      Petitioner is currently in the custody of the California Department of Corrections and

24 Rehabilitation pursuant to a judgment of the Superior Court of California, County of Fresno,

25 following his conviction by jury trial on September 20, 2011, of assault with a deadly weapon

26 (Cal. Penal Code § 245(a)(1)) and two counts of resisting an officer (Cal. Penal Code § 69).

27

28

(LD[1] 1.)  He was sentenced to a total determinate term of 15 years and 8 months.

Petitioner timely filed a notice of appeal.  On December 28, 2012, the Fifth District Court of Appeal affirmed the judgment.  (LD 1.)  Petitioner did not petition for review in the California Supreme Court.  However, he filed a petition for writ of habeas corpus in the California Supreme Court on March 25, 2013.  (LD 5.)  The petition was summarily denied on May 15, 2013.  (LD 6.)

On August 19, 2013, Petitioner filed the instant federal habeas petition in this Court.  He raises the following grounds for relief: 1) He alleges the trial court erred by admitting testimony of Petitioner's prior violent contacts with law enforcement; 2) He contends the trial court erred by failing to review records of charging officers pursuant to his discovery request under Pitchess v. Superior Court, 11 Cal.3d 531 (1974); 3) He claims the prosecutor committed misconduct; and 4) He alleges the evidence denied him was exculpatory and material.  On February 5, 2014, Respondent filed an answer to the petition.  Petitioner did not file a traverse.

## II.

## STATEMENT OF FACTS[2]

### Testimony of Jimmy Perez

On November 22, 2010, appellant, Jimmy Perez, and other people were homeless and living in Pilibos Park in southeast Fresno. On that afternoon, Perez was barbecuing food at the park and was sitting with a number of friends, including Aaron Aylward and Matthew Ortega. Perez testified that appellant approached him and claimed that Perez has sexually assaulted one of his relatives. Appellant then began hitting Perez with a board that was "[a]bout six feet tall with a little point on the end ... a little tiny stick sticking out of it, like a point." Appellant struck Perez five or six times on the arm and broke his limb and the board itself.

Perez testified, "He [appellant] came to me. He was all loaded. He was on methamphetamine. He was loaded. He didn't want to f* * *ing calm down or nothing. He just kept on hitting me." The prosecutor asked Perez whether he had ever stolen anything from appellant. Perez said, "I don't steal from him. I don't steal from nobody. I'm a homeless guy. I don't like stealing. If you're homeless, you don't steal."

---

[1] "LD" refers to the documents lodged by Respondent with his answer.

[2] The appellate court's summary of the facts in its December 28, 2012, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the Fifth DCA. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir.2009), cert. denied, 130 S.Ct. 1086 (2010) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

*Testimony of Aaron Aylward*

Aylward was sitting at a picnic table when appellant approached and began to speak with Perez. Aylward said appellant was "carrying a 2 x 4, I don't know, maybe four or five feet long." Appellant started circling the picnic tables near the barbecue but kept his eye on Perez. According to Aylward, appellant said he knew what Perez had done. Aylward also remembered appellant saying something about Perez raping his niece and then hitting Perez with the board. Aylward said appellant swung the board like an ax and caught Perez in the left arm. Aylward said appellant struck Perez at least two times and then walked away "towards the back end of the park," near Willow Avenue. Aylward said that Perez had been drinking on November 22, and that Perez had been known to steal possessions from other people in Pilibos Park. However, Aylward said Perez and appellant had no problems in the past.

*Preliminary Hearing Testimony of Matthew Ortega*

Matthew Ortega was unavailable to testify as a witness at trial and his preliminary hearing testimony was read into the record. Ortega said he was preparing food and barbecuing in the park late on the afternoon of November 22 while others sat around a picnic table. Ortega testified that appellant angrily approached Perez, struck him several times with a long piece of two-by-four board, and then walked away. Ortega heard appellant say something about Perez raping his niece. Ortega said he was surprised by appellant's anger because he saw appellant regularly and never saw him display that emotion.

*Testimony of Melanie Dorian*

Fresno Police Officers Melanie Dorian and Gregory Catton responded to Pilibos Park to investigate the incident. They contacted Perez, who was agitated and upset. He told the officers a black male adult had struck him with a board and that the man was still in the park. His left ear was bleeding and he was holding his left arm. Dorian observed a large bump on the forearm close to his elbow. Perez indicated that the suspect had gone to the northeastern portion of the park and the two officers contacted appellant there. Appellant was holding two long pieces of wood and appeared to be moving them in a martial arts style. Dorian said the two pieces fit together to form one piece of wood and that a sharpened wooden dowel about seven inches long had been affixed to the long piece of wood. At trial, one of the two long pieces of wood measured 38 inches long and the other measured 48 inches long.

The two officers ordered appellant to drop the sticks and he complied after hesitating several seconds. Dorian said that after hesitating, appellant first dropped one piece of wood and then the other. Dorian and Catton ordered him to raise his hands above his head because the two pieces of wood were within his reach and his hands were at his sides. Dorian said appellant bent his elbows and raised his hands, palms out, to the height of his chin. The officers then repeatedly ordered him onto his knees, but appellant went down only on one knee. According to Dorian, appellant never said that he could not get down on his other knee because it hurt or was injured.  Dorian explained that one knee was insufficient because, "He could easily push off of one knee and charge us or run away. He's not controlled." She also explained that "[w]hen his hands were at shoulder height, he was still glancing at the ground, glancing back at us, and I believed he was considering reaching down and grabbing the pieces of wood."

Dorian told appellant that he was in danger of being shot with a "less lethal" beanbag shotgun. Appellant did not respond to Dorian's statement. Officer Catton attempted to grab appellant's hands, and appellant began to fight with him. Dorian covered appellant as Catton attempted to "grab ahold of his hands." Appellant struck Catton's hands away. As appellant attempted to lie on his back, Dorian fired one shot, and the beanbag struck appellant in the lower chest/mid-torso area, without effect. Dorian determined the "less lethal" shotgun was not going to be an effective weapon against appellant and she did not shoot any more rounds.

Dorian said she and Catton engaged in "an ongoing physical struggle where we were constantly moving in to try to control his hands and Mr. Kelley was punching at us and kicking at us and causing us to back away...." Dorian said Catton continued to struggle with appellant and Catton deployed his Taser three times.  Dorian explained the functioning of a Taser in this fashion: "The Taser has a cartridge that fits on the end of it, and inside the cartridge are two darts and they are connected to two wires, and the wires are 25 feet long. They come in different lengths. You can deploy the Taser either [with or] without the cartridge, in which case you would have to push it up against somebody and it would, you know, only affect the area where they are struck, or if you fire it with the darts and both of the darts hit the target, it creates a circuit and it causes their muscles to seize, and usually they're unable to move for several seconds. The Taser cycles about three seconds, so it would be three seconds of feeling that." Dorian further explained that when Taser darts are affixed to an individual's body, an officer can make multiple applications of the Taser. On cross-examination, Dorian said the Taser device has a voltage of 50,000. She added that individuals who are Tased frequently "clench up, ball up, [are] unable to move. However, Mr. Kelley seemed to be able to fight through it and continue to move."  The Taser darts initially had an effect on appellant but, according to Dorian, appellant "was able to work through that and began to fight us again." After the first deployment of the Taser, appellant stopped moving, and the officers unsuccessfully attempted to turn him on his stomach and handcuff him. When appellant worked through the effects of the first Tasering, he punched and kicked at the officers. After the second application of the Taser, appellant tore Taser darts from his chest and then kicked Dorian in the collar bone and diaphragm area, knocking the wind out of her. Dorian said the darts were still attached to appellant's body when Catton deployed the Taser a third time. The third application of the Taser did not subdue appellant, and he continued to kick at the officers. Dorian said they continued to struggle with him and tried to roll him over but he was very strong and "a skilled fighter." The officers eventually subdued appellant by each grabbing one of his hands and rolling him over on his stomach. Dorian handed her handcuffs to Catton, who placed them on appellant. Dorian said they were able to subdue appellant after he kicked at her a second time.

Officer Dorian said the struggle lasted around four minutes, and then the officers requested emergency medical services to obtain treatment for appellant's injuries. The emergency personnel took appellant to the hospital, and the officers went with him. At the hospital, appellant waived his rights and agreed to talk to Dorian. Appellant told Dorian he had consumed methamphetamine and Dr. Pepper that day. Appellant also said that he was present in Pilibos Park that day because "he likes to come to the park to watch the pretty females." Appellant said he saw one female who appeared to have been hurt by someone, although appellant admitted that he did not speak with her. Appellant said he knew this by looking in her eyes. After observing the female, appellant went near Perez and thought he heard Perez say under his breath that "he had done it." At that point, appellant ordered Perez to leave the park. After Perez refused, appellant struck him with one of the sticks.

Although Aylward testified the wood that appellant held was in the nature of a two-by-four piece of lumber, the officers referred to the broken wood as "sticks." Appellant explained he struck Perez in order to "save face" in the park community because "he had told Mr. Perez to leave and Mr. Perez had not listened to him." Appellant told Dorian at the hospital that he did not know Perez and that "his leg had accidentally flown up" to hit her chest twice during their encounter. She acknowledged that appellant was wearing tennis shoes at the time of their contact.

### Testimony of Gregory Catton

Officer Catton testified he and Dorian were on patrol duty in southeast Fresno on the late afternoon of November 22, 2010. Catton said he and Dorian went to Pilibos Park at the corner of Lane and Winery Avenues, drove onto the park property, and contacted Jimmy Perez in the center of the park. Catton said Perez appeared a little intoxicated and had a lot of blood on his body. Catton saw injuries to Perez's left ear and also said "his left arm was deformed near the elbow and swollen." According to Catton, Perez said a person had approached him with a wooden pole, accused him of committing crimes against a family member, and then struck him in the head and arm with the pole. Perez did not point out the assailant to Catton but described him as a black male in his 50s dressed in a sweatshirt and shorts. Perez told Catton the individual had walked northeast into the park. Catton drove in that direction and located appellant in 10 to 15 seconds. Catton said appellant was holding two pieces of two-by-four wood, one in each hand. Catton explained, "[I]t looked like he was doing martial arts or that he knew what he was doing with the boards. He was twirling them and that kind of thing."

Catton recognized appellant from a prior contact and called out to him from a distance of 15 or 20 yards, "Marc, put the sticks down." Catton said he had his pistol drawn and pointed at appellant when he issued the command. Appellant did not immediately obey the command. Catton said he waived the sticks for about 10 seconds and posed in a threatening manner. Catton said appellant eventually placed the sticks about a foot away from his feet. When appellant dropped the sticks, Catton told him to place his hands on his head and walk toward the two officers. Appellant stood still and did not obey the commands. He eventually placed his hands at his sides "kind of in a cross position." Catton told appellant to get down on his knees, and he eventually got down on one knee. Appellant did not tell the officers he had something wrong with his legs, and Catton did not see a brace on either of appellant's knees.

Catton and Dorian ultimately approached appellant "at angles." Catton had his gun in his hand and Dorian had the less lethal shotgun in her hands. Catton put his gun away when he was approximately two feet away from appellant. At that point appellant was on one knee and Catton grabbed appellant by the left wrist. Appellant slapped Catton's hand away. Catton grabbed appellant's arm and wrist again and tried to place him in a rear wrist lock. However, appellant struggled out of it and laid on his back. Catton said the weapons were still within appellant's reach at that point. Catton said appellant rolled from side to side and kicked "with both of his feet up in the air towards myself several times, and I saw him kick towards Officer Dorian, also." Catton said he and Dorian were "pretty much shoulder to shoulder" at this point in time.

While appellant was kicking in the air, Catton unholstered his Taser, explaining, "I was going to apply the Taser because I could create some distance between myself and Mr. Kelley kicking." As Catton removed his Taser, he heard Dorian

say, "Less lethal," and then fire one round. Catton did not know whether the less lethal discharge hit appellant because it had no immediate effect on appellant. Appellant continued to kick and roll and would not submit his hands for cuffing. At that point, Catton applied the Taser and appellant became rigid and stopped moving for about five seconds, the normal cycle of the device. After the five seconds elapsed, appellant began to kick and roll again, despite Catton's verbal commands to comply with the officers' orders. Catton said he applied the Taser three or four more times.

Catton said appellant pulled the Taser darts from his skin and the device was no longer effective. Catton said he had employed his Taser on 10 or 15 previous occasions and no one before had removed the Taser darts. Catton said appellant began to kick and fight the officers again. When Catton took time to manually reload the Taser, he saw appellant kick Dorian "hard" in the chest and leg area. Catton reloaded the Taser and applied it again. He said the Taser was effective during the five-second cycle and that appellant continued to fight and kick after the cycle elapsed. After one application of the Taser, appellant rolled onto his stomach during the cycle and the officers were able to handcuff him. An ambulance took appellant to the hospital and the officers followed him there. Catton said the fighting between appellant and the officers took a minute and one-half. Catton saw Perez at the hospital and said he had lacerations on the top and front portion of his left ear.

*Testimony of Clifton MacDonald*

Fresno Police Officer Clifton MacDonald testified that he obtained witness statements in connection with the November 22, 2010, incident. He said he spoke to Aaron Aylward, who had been at the park at the time of the incident. Aylward said he and his friend, Jimmy, were sitting on benches in the center of Pilibos Park and someone named Mark was standing nearby. Aylward heard Marc mutter something under his breath and then proceed to circle the benches. According to Aylward, Marc told Jimmy that "he knew what he did." Jimmy responded, "'I don't know what you're talking about.'" Marc continued to circle the benches and said, "'You're gonna pay. I know you raped my niece.'" Marc said the niece's name was "Kayla." Jimmy replied, "'I don't know what you're talking about. I don't know your niece.'" Aylward said Marc was holding a wood stick with nails at one end and struck Jimmy in the shoulder with the stick. When Jimmy jumped off the park bench, Marc struck Jimmy an additional four to six times in the shoulder, head, and back. Although four or five other people were present in Pilibos Park at the time of the interview, MacDonald did not talk to anyone else.

*Defense Evidence*

Appellant testified on his own behalf. Appellant said Perez had approached him on two occasions prior to November 22, 2010, and demanded cash and beer at knifepoint. Appellant also said that Perez had stolen his personal possessions on other occasions. Appellant said he approached Perez on the afternoon of November 22 and politely asked him for the return of his personal possessions. In making the request, appellant told Perez, "I didn't appreciate how he recklessly eye-balled or raped my niece when she came up to the park to pick me up one day." Appellant explained that Perez leered at his niece and other Sunnyside High School students and made sarcastic remarks and sexual innuendos. Appellant said Perez became very hostile and angry, turned red, and made a racial slur. According to appellant, Perez then put his hands in his jacket pocket and then pulled out a knife with a four-to-six-inch blade. On an earlier occasion, Perez

allegedly told appellant, "'I can get away with carrying this knife because I am considered crazy ... so I won't get in trouble.'"

Appellant said Perez lunged at him several times with the knife and said appellant did not know what he was talking about. At that point, appellant picked up a board to protect himself. Appellant said he struck Perez with the board to disengage the knife. Appellant said the knife struck Perez's arm and ear. Although appellant's blows did not cause Perez to drop the knife, Perez responded by throwing canned goods at appellant. At that point, appellant went to the "northeast corner" of the park, away from appellant and his friends.

Appellant said police officers arrived at the scene and ordered him to drop the sticks. Appellant said he complied with their command. Appellant said he complied with the officers' order to raise his hands above his head but could not comply with their order to get down on both knees. Appellant explained that he had surgery on his left knee, which prevented him from getting down "all at once on two knees." Appellant said he explained this condition to the officers. According to Officer Dorian, appellant did not mention an injury to his leg on the date of the incident in Pilbios Park. She said she had contact with him in May 2010 and at that time appellant was wearing a leg brace. Dorian said she questioned the necessity for appellant's brace in 2010, testifying: "Early in the afternoon when I contacted him [in May 2010], he was wearing a brace. He made a big deal out of being unable to bend his leg to get in the patrol car. Later in the evening I had reason to come in contact with him again, at which point he ran from us full sprint weaving, dodging back and forth. He looked like a football player, you know, running down the field. He looked like he was in very good health." Dorian added that she could not observe anything wrong with his leg when he ran at the time of that second contact in May 2010.  Appellant also said he eventually complied with the officers' orders to lay face down on his stomach. After he did so, he experienced convulsions and blacked out from being Tased. Appellant said the officers applied the Taser multiple times, but he did not try to punch either of them. He said he was in pain and could not really understand what the officers were saying. He also said he could not see or control his body because of the Tasering.

Appellant said he spoke with Officer Dorian at the hospital. He claimed she intimidated him by placing her hand on the Taser while speaking with him. He denied telling Dorian that he was on methamphetamine that day. On cross-examination, appellant admitted he was convicted of felonious assault on June 29, 2007. However, he denied having an encounter with Dorian in May 2010, a number of months before the incident underlying this case. Appellant said he defended and protected himself against Perez because Perez lunged at him with a knife. Appellant said he did not hit or kick the two officers. Appellant admitted that he had a previous encounter with Dorian, and that she knew he had used methamphetamine in the past. Appellant also said that at their prior encounter, Officer Dorian "told me that the next time she sees me, every time she sees me she's gonna bust me. She's gonna haul me in."

*Rebuttal Evidence*

Officer Dorian testified that appellant was not Tased because of prior incidents with police. She said that force was applied in this instance because the situation dictated it. She explained, "My prior experience with Mr. Kelley, my knowledge of his methamphetamine use, my knowledge from training and experience that people who use methamphetamine are unpredictable and dangerous, the situation

at hand in which Mr. Kelley was holding the weapons with which he had actually injured somebody, visible very distinct injury, we felt the need, I felt the need to use force to protect myself, to protect my partner, to protect the number of people that were at the park. There were people playing soccer. There were families. There were a lot of people at the park that day." Dorian said she did not threaten appellant to get him to speak with her at the hospital and did not hold her Taser when she spoke with him.

(LD 1.)

## III.

## DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Fresno County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.    Standard of Review

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624 (2011); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 413.

1      As a threshold matter, this Court must "first decide what constitutes 'clearly established

2   Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71

3   (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this

4   Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

5   of the time of the relevant state-court decision." Williams, 592 U.S. at 412.  "In other words,

6   'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

7   set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition,

8   the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

9   principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

10  . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

11  review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009) (quoting Wright v.

12  Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

13  Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an

14  end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S.

15  at 126; Moses, 555 F.3d at 760.

16      If the Court determines there is governing clearly established Federal law, the Court must

17  then consider whether the state court's decision was "contrary to, or involved an unreasonable

18  application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28

19  U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ

20  if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

21  question of law or if the state court decides a case differently than [the] Court has on a set of

22  materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

23  72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite

24  in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's

25  Third New International Dictionary 495 (1976)).  "A state-court decision will certainly be

26  contrary to [Supreme Court] clearly established precedent if the state court applies a rule that

27  contradicts the governing law set forth in [Supreme Court] cases." Id.  If the state court decision

28  is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed

1 under the pre-AEDPA de novo standard.  Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en
2 banc).

3    "Under the 'reasonable application clause,' a federal habeas court may grant the writ if
4 the state court identifies the correct governing legal principle from [the] Court's decisions but
5 unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at
6 413.  "[A] federal court may not issue the writ simply because the court concludes in its
7 independent judgment that the relevant state court decision applied clearly established federal
8 law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411;
9 see also Lockyer, 538 U.S. at 75-76.  The writ may issue only "where there is no possibility
10 fairminded jurists could disagree that the state court's decision conflicts with [the Supreme
11 Court's] precedents."  Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists
12 could disagree on the correctness of the state courts decision, the decision cannot be considered
13 unreasonable.   Id.   If the Court determines that the state court decision is objectively
14 unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the
15 error had a substantial and injurious effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619,
16 637 (1993).

17    Petitioner has the burden of establishing that the decision of the state court is contrary to
18 or involved an unreasonable application of United States Supreme Court precedent.  Baylor v.
19 Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the
20 states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a
21 state court decision is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669
22 (9th Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

23    AEDPA requires considerable deference to the state courts.  "[R]eview under §
24 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on
25 the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review."
26 Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations
27 by state courts are presumed correct absent clear and convincing evidence to the contrary."
28 Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)).  However, a

state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review.   Townsend v. Sain, 372 U.S. 293, 319 (1963), *overruled by*, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

**C.    Review of Claims**

1.    Admission of Prior Conduct

In his first claim for relief, Petitioner contends the trial court erred by admitting testimony regarding his prior violent contacts with law enforcement.   He alleges the evidence was unduly prejudicial and may have led the jury to believe the uncharged evidence.   He claims the jury may have based its verdict on this evidence.

This claim was presented on direct appeal to the Fifth District Court of Appeal.   The claim was denied in a reasoned decision.   Petitioner then raised the claim to the California Supreme Court in a petition for writ of habeas corpus.   The petition was denied without comment.   When the California Supreme Court's opinion is summary in nature, the Court must "look through" that decision to a court below that has issued a reasoned opinion.   Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).   Here, the appellate court analyzed and rejected the claim as follows:

> Appellant contends the trial court erroneously admitted Officer Dorian's testimony about "a prior violent contact with appellant some months before the current charged offense." Appellant acknowledges "the District Attorney sought to introduce this testimony ... to explain Officer Dorian's reactions to appellant's conduct on November 22," but nevertheless contends the admission of the evidence of past contacts constituted prejudicial error.
>
> *A. Procedural History*
>
> On September 14, 2011, appellant filed a trial brief and motions in limine. Appellant moved to exclude any reference to Officer Dorian's alleged prior contacts with appellant, asserting: "[A]ny references to the alleged prior contacts create an inference that Mr. Kelley is a career felon and/or trouble maker. Such evidence has no probative value as it is not necessary to prove a fact that is of consequence to this action and creates a substantial danger of undue prejudice to Mr. Kelley." At the contested hearing on the motion, the prosecutor argued, "It goes to her reasonableness of use of force. Her prior contacts with Mr. Kelley were resisting. In fact, one of the victims [of the earlier contacts] was the same [officer], Melanie Dorian ... it explains the reasonableness [of] her conduct, and that's part of PC 69's elements."
>
> In response to questioning by the court, defense counsel acknowledged that the defense position was that excessive force had been used and that Officer Dorian's

prior contacts were relevant. However, counsel stated, "I'm just nervous because the jury might perceive as he's like a career felon, a troublemaker, that's my concern." The court noted, "It would be admitted for a limited purpose and instructed on under a limited purpose, would it not?" Defense counsel replied, "Well, if the Court was inclined to allow it, I would request that there would be in limine instructions." The court acknowledged counsel's concern and said, "[I]f there is specific conduct that has relevance here, we've got to instruct the jury as to the proper way to consider it." Later in the proceedings on the in limine motions, the prosecutor noted that Dorian's prior contacts with appellant went to her reasonableness and her actions on November 22, 2010. The prosecutor further noted, "Officer Dorian could only speak to her own personal experience or things she witnessed directly, and I've instructed her as such and will instruct her again." The court advised, "[T]here are not to be any disparaging comments reflected upon status or incarceration or probation or anything of that nature. It would be directly limited to her personal prior contact with Mr. Kelley that would affect her actions in this particular event." The court further advised, "I think that she can talk about the prior contact and the fact that she has had a physical confrontation."

At trial, Officer Dorian testified on direct examination that she and Officer Catton arrived at Pilibos Park on November 22 and saw appellant waving sticks "in a martial arts fashion." She testified, "I recognized him from prior contact and I yelled his name, Marc Kelley, to get his attention." During the prosecution's case-in-chief, Dorian testified that she questioned appellant at the hospital, and he said he had mixed methamphetamine with Dr. Pepper on the afternoon of November 22. During the direct examination in the defense case, appellant said, "[S]he [Dorian] looked pretty angry when she came up because of previously meeting." He explained, "She told me that the next time she sees me, every time she sees me she's gonna bust me. She's gonna haul me in." On cross-examination in the defense case, the prosecutor asked appellant about his methamphetamine use on November 22. Appellant said he had Gatorade and food that day but did not tell Dorian he had mixed methamphetamine with Dr. Pepper. When asked about the latter point, appellant said, "I told her in a previous encounter, that's how she knows. She arrested me, and that's how she knows." On rebuttal, Dorian testified she had prior experience with appellant and knew of his methamphetamine use. She also testified that from her training and experience, she knew that people who use methamphetamine can be unpredictable and dangerous.

*B. Appellant's Specific Contention*

Appellant contends the jury was presented with two different versions of events and "it is more than reasonable to infer that the jury, once having heard appellant engaged in similar conduct with Officer Dorian on a prior occasion, would find that he resisted attempts to handcuff him and kicked her in the current case. In this case there was no issue as to identity, motive, common design or plan. None of the normal reasons for admitting testimony under [Evidence Code] section 1101(b) existed in this case. The only reason was to establish that appellant was a person who had shown a propensity to violently resist law enforcement officers when contacted by them."

*C. Analysis*

Appellant's contention must be rejected for several reasons. First, Officer Dorian did not testify about prior contacts with appellant in which appellant resisted Dorian or obstructed the performance of her official duties. At most, the evidence showed that appellant and Dorian had prior contacts, and that she was aware of

his methamphetamine usage from those contacts. Second, the motion in limine at trial was based on "relevancy and [section] 352 of the Evidence Code." Appellant did not move in limine or interpose an objection based on Evidence Code section 1101, the statute relied on in his appellate briefs. Questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal. (People v. Seijas (2005) 36 Cal.4th 291, 302.)

Finally, at the September 14, 2011 hearing outside the jury's presence, the court asked defense counsel, "As I understood our informal discussions, Mr. Moore, wasn't part of your position here that there was excessive force used [by the officers]?" Defense counsel responded, "Yes, there was." The court then asked, "And, therefore, wouldn't all of that [evidence of prior contacts between Dorian and appellant] be relevant?" Counsel replied, "It would. I'm just nervous because the jury might perceive [that appellant is] like a career felon, a troublemaker, that's my concern." From the entirety of the record, it seems clear that appellant and Dorian had a contact prior to November 22, 2010, and that appellant had used methamphetamine before seeing Dorian and Catton on November 22, 2010. However, the two brief references to Dorian's prior contact with appellant and appellant's consumption of methamphetamine and soda did not equate to a depiction of appellant as a career felon or troublemaker. Moreover, these two brief references in the prosecution's case-in-chief fell far short of appellant's assertion that the trial court admitted "testimony of Officer Dorian regarding prior violent contacts with appellant."

Appellant must be mindful that he was charged with two counts of resisting an executive officer (§ 69). Section 69 sets forth two separate ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law. The second is resisting by force or violence an officer in the performance of his or her duty. (In re Manuel G. (1997) 16 Cal.4th 805, 814–815.) Section 69 is designed to protect police officers against violent interference with performance of their duties. While the object of the offense may not be to attack a peace officer, its consequence is frequently to inflict violence on peace officers or subject them to the risk of violence. (People v. Martin (2005) 133 Cal.App.4th 776, 782.) A violation of section 69 does not require a showing of the state of mind of the recipient of the threat. (People v. Gutierrez (2002) 28 Cal.4th 1083, 1153.) Nevertheless, evidence of appellant's prior contact with Dorian was probative to the extent it showed that appellant knew that Dorian was performing her duty when he acted and whether or not she used unreasonable or excessive force in the performance of her duties (CALCRIM No. 2652).

The trial court did not commit reversible evidentiary error arising from Officer Dorian's testimony about her prior contact with appellant.

(LD 1.)

A federal court in a habeas proceeding does not review questions of state evidence law. Our inquiry is limited to whether the evidence ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Thus, the question here is not

1    whether the state's exclusion of evidence violated state evidentiary rules, but whether the

2    exclusion of evidence resulted in a decision contrary to or that involved an unreasonable

3    application of established Supreme Court precedent. Id., Williams, 529 U.S. at 412. It is, in fact,

4    possible for a state court to violate its rules of evidence without resulting in a trial so unfair as to

5    violate due process. Jamaal, 926 F.2d at 919. "A state court's evidentiary rulings can form the

6    basis for habeas relief under the due process clause only when they were so conspicuously

7    prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due

8    process." Osborne v. Purkett, 411 F.3d 911, 917 (8th Cir. 2005) (citing Parker v. Bowersox, 94

9    F.3d 458, 460 (8th Cir. 1996)).

10        With respect to the admission of evidence, there is no Supreme Court precedent

11   governing a court's discretionary decision to admit evidence as a violation of due process. In

12   Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.2009), the Ninth Circuit stated:

13        The Supreme Court has made very few rulings regarding the admission of
          evidence as a violation of due process. Although the Court has been clear that a
14        writ should be issued when constitutional errors have rendered the trial
          fundamentally unfair, [Citation omitted.], it has not yet made a clear ruling that
15        admission of irrelevant or overtly prejudicial evidence constitutes a due process
          violation sufficient to warrant issuance of the writ. Absent such "clearly
16        established Federal law," we cannot conclude that the state court's ruling was an
          "unreasonable application." [Citation omitted.] Under the strict standards of
17        AEDPA, we are therefore without power to issue the writ . . . .

18        Indeed, the Supreme Court has expressly reserved consideration of whether admission of

19   propensity evidence may violate due process. Alberni v. McDaniel, 458 F.3d 860, 863-64 (9th

20   Cir.2006); Estelle, 502 U.S. at 75, n. 5. Since there is no clearly established Supreme Court

21   precedent governing a trial court's discretionary decision to admit evidence as a violation of due

22   process, habeas relief is foreclosed.    Holley, 568 F.3d at 1101. Therefore, Petitioner cannot

23   demonstrate that the state court decision was contrary to, or involved an unreasonable application

24   of, clearly established federal law. See 28 U.S.C. § 2254(d). The claim must be denied.

25        2.    Discovery of Police Officers' Personnel Files

26        Petitioner next alleges the trial court erred by failing to conduct an in camera review of

27   the police officers' personnel files pursuant to Petitioner's discovery request under Pitchess v.

28   Superior Court, 11 Cal.3d 531 (1974). Petitioner complains that the files may have contained

evidence of the officers using excessive force in the past, and this evidence would have been useful to the defense.

This claim was also presented on direct appeal to the Fifth District Court of Appeal where it was denied in a reasoned decision.  It was then raised to the California Supreme Court by petition for writ of habeas corpus, whereupon it was summarily denied.  When the California Supreme Court's opinion is summary in nature, this Court must "look through" to the reasoned decision of the court below.  Ylst, 501 U.S. at 804-05 & n. 3.  The appellate court denied the claim as follows:

> Appellant contends the trial court committed reversible error by denying his request for a pretrial review of the personnel records of Officers Dorian and Catton under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

> *A. Procedural History*

> On July 11, 2011, appellant filed a motion for pretrial discovery under *Pitchess*. His counsel stated in an accompanying declaration: "The information contained in the personnel files of Officer Catton and Officer Dorian would be used by the defense to enable it to effectively cross-examine the officers during the trial for impeachment, in that Mr. Kelley herein alleges that Officer Dorian and Officer Catton used excessive force, and may have falsified their investigation reports in order to support the probable cause for the charged offenses." Counsel also declared on information and belief that "from time to time persons who have been arrested and/or detained by Officer Dorian and Officer Catton have made complaints to their police agencies alleging they have also been victims of excessive force, aggressive conduct, violence, fabrication, or falsification of police reports."

> The court conducted a hearing on the motion on August 15, 2011. Defense counsel argued: "Your Honor, I think in the motion we lay out that Mr. Kelley ... was tasered multiple times, shot with a ... rubber gun. He complied with [the] officers['] request, and I think the officers conducted in—it was excessive force." Counsel for the Fresno Police Department custodian of records stated, "The police department does indicate that he was shot with the less lethal [beanbag shotgun]. It indicates all the things [defense] Counsel is saying. The only issue here is whether in Mr. Kelley's [case]—it [the report] doesn't say he didn't resist arrest. It doesn't give [any] factual basis for getting into in camera...."

> The trial court denied the motion stating: "Well under Evidence Code [section] 1043, a motion to discover a peace officer's personnel records [has] to be supported by an affidavit that shows good cause and supports materiality of the requested information. And that all depends on the sufficiency of the factual allegations. [¶] You failed to state any plausible factual allegations or any scenario of excessive force other than what has already been stated as having occurred. Therefore the motion is denied due to the insufficiency of the affidavit and declaration."

_B. Appellant's Specific Contention_

Appellant contends "the trial court refused to even examine the records in camera although they were apparently present in court with counsel representing the Fresno Police Department. It seems totally unreasonable, based upon appellant's motion and declarations, to fail to review the records and determine whether or not either Officer Catton or Officer Dorian had a history of aggressive behavior toward arrestees or other citizens. In this case there was clearly a difference of opinion as to what occurred between appellant and the officers on November 22.[¶] If the file contained complaints of excessive force against either officer, disclosure of the complainants and permitting appellant to investigate those complaints was clearly in order."

_C. Applicable Law_

In _Pitchess, supra_, 11 Cal.3d 531, the Supreme Court recognized that a criminal defendant has a limited right to discovery of a peace officer's confidential personnel records if those files contain information that is potentially relevant to the defense. To initiate discovery, a defendant must file a motion seeking such records. The motion must include affidavits showing good cause for the discovery or disclosure sought, and set forth the materiality thereof to the subject matter involved in the pending litigation. (Evid.Code, § 1043, subd. (b)(3).) Good cause requires the defendant to establish a logical link between a proposed defense and the pending charge, and to articulate how the discovery would support such a defense or how it would impeach the officer's version of events. The threshold for establishing good cause is relatively low. The proposed defense must have a plausible factual foundation supported by the declaration of defendant's counsel and other documents. A plausible scenario is one that might have or could have occurred. "The 'defendant must also show how the information sought could lead to or be evidence potentially admissible at trial. Once that burden is met, the defendant has established materiality under [Evidence Code] section 1043.' [Citation.]" (_People v. Moreno_ (2011) 192 Cal.App.4th 692, 700–701; _Garcia v. Superior Court_ (2007) 42 Cal.4th 63, 69.)

If the defendant establishes good cause, the trial court must review the requested records in camera to determine what information, if any, should be disclosed. Subject to certain statutory exceptions and limitations, the trial court should disclose to the defendant such information that is relevant to the subject matter involved in the pending litigation. An appellate court reviews the denial of a _Pitchess, supra_, 11 Cal.3d 531 motion for abuse of discretion. (_People v. Moreno, supra_, 192 Cal.App.4th at p. 701.) "'[A]ll discretionary authority is contextual.'" (_People v. Carmony_ (2004) 33 Cal.4th 367, 377.) All exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue. Nevertheless, the abuse of discretion standard is deferential. (_People v. Cluff_ (2001) 87 Cal.App.4th 991, 998.) An appellate court does not substitute its judgment for that of the trial court. (_People v. Myers_ (1999) 69 Cal.App.4th 305, 310.) An exercise of trial court discretion is reviewable only for abuse and "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (_People v. Rodriguez_ (1999) 20 Cal.4th 1, 9–10; _People v. Carmony, supra_, 33 Cal.4th at p. 377.)

### D. Analysis

In this case, the court concluded that the affidavit of appellant's trial counsel was insufficient because it "failed to state any plausible factual allegations or any scenario of excessive force other than what has already been stated as having occurred." Although appellant's trial counsel acknowledged this ruling, counsel observed, "I think that the conduct in itself is sufficient." On appeal, appellant contends his motion and counsel's declaration "stated adequate grounds for the court to, at a minimum, review the officers' files in camera and determine[ ] what if any information was to be disclosed to the defendant."

"To show good cause as required by [Evidence Code] section 1043, defense counsel's declaration in support of a *Pitchess* motion must propose a defense or defenses to the pending charges. The declaration must articulate how the discovery sought may lead to relevant evidence or may itself be admissible direct or impeachment evidence [citations] that would support those proposed defenses." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1024.) To obtain in-chambers review of documents or information in an officer's personnel file that is potentially relevant to claimed misconduct, "a defendant need only demonstrate that the scenario of alleged officer misconduct could or might have occurred." (*Id.* at p. 1016.) The defendant must "not only establish a logical link between the defense proposed and the pending charge, but also articulate how the discovery being sought would support such a defense or how it would impeach the officer's version of events." (*Id.* at p. 1021.) Counsel's affidavit must describe a factual scenario supporting the claimed officer misconduct. (*Warrick v. Superior Court, supra,* 35 Cal.4th at pp. 1016, 1021.)

In this case, the notice of motion filed July 11, 2011, characterized appellant's defense in this fashion: "[T]hat the involved officers, Dorian (V3320), and Catton (P1497), may have made deliberate false material misrepresentations and/or omissions in the incident report ... and/or used excessive force during the arrest of Mr. Kelley." The accompanying declaration of counsel alleged: "Specifically, I am informed and believe to be true that Officer Dorian and Officer Catton used excessive force upon Mr. Kelley during this incident. The officers might claim Mr. Kelley was resisting therefore they initiate[d] enough force to effectuate the arrest." (Italics omitted.) The written opposition of the custodian of records, filed August 2, 2011, observed: "Defense has not stated any defense or any logical connection between the charges the Defendant faces and their defense. Defense merely states that the force used was excessive and does not dispute the facts as set forth in the police reports."

"'[A]n affirmative defense is one which presumes the prima facie elements of the crime are true, but exculpates the defendant because of excuse or justification. [Citations.] Stated another way, an affirmative defense is one which does not negate any element of the crime, but is new matter which excuses or justifies conduct that would otherwise lead to criminal responsibility.'" (*People v. Spry* (1997) 58 Cal.App.4th 1345, 1368–1369.) Appellant cites no authority for the proposition that asserted false reports and excessive force on the part of law enforcement officers comprise an affirmative defense to section 69. As respondent notes on appeal, the prosecution did not dispute the nature and extent of the force employed by Officers Catton and Dorian and detailed in their police reports. The declaration of appellant's trial counsel summarily accused the two officers of using excessive force but did not address or contradict the factual elements of the police reports, i.e., that appellant resisted arrest; failed to raise his arms, drop to both knees, and rest on his stomach upon the orders of the officers;

17

kicked Dorian in the upper chest; and fought with Catton. Further, the declaration of appellant's trial counsel did not aver the absence of resistance on appellant's part or explain how the officers' personnel records—records of past incidents, if any—would lead to relevant evidence or admissible impeachment evidence in this case, particularly where the officers fully acknowledged the types and degrees of force employed in the current incident.

In our view, appellant has not set forth a proposed defense, established a plausible factual foundation for the alleged officer misconduct, or articulated a valid theory as to how the requested information might be admissible at trial. Given the foregoing circumstances, appellant was not entitled to have the trial court review the requested records in camera to determine what information, if any, should be disclosed. (*People v. Gaines* (2009) 46 Cal.4th 172, 178–179.) The trial court did not abuse its discretion by declining to conduct an in camera *Pitchess* review of the officers' personnel records. (*Uybungco v. Superior Court, supra*, 163 Cal.App.4th at p. 1049.)

(LD 1.)

On habeas corpus review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States. Habeas relief does not lie for errors of state law. Estelle v. McGuire, 502 U.S. 62, 67 (1991). To the extent Petitioner is claiming that the trial court's denial of his Pitchess motion violated state law, the claim is not cognizable on federal habeas review. Id. Thus, this Court limits its consideration to the claim of a federal constitutional violation.

A trial court's denial of a defendant's Pitchess motion is cognizable in habeas corpus where the denial implicates the defendant's due process right to receive material exculpatory and impeachment evidence. See Gordon v. Puckett, 2010 WL 891265, at *10 (C.D.Cal. March 7, 2010) ("Although a Pitchess motion is a creature of state law, it may implicate a prisoner's due process right to receive material exculpatory and impeachment evidence.") (citing Harrison v. Lockyer, 316 F.3d 1063, 1065-66 (9th Cir.2003)).  The prosecutor is obligated to produce to the defendant any evidence, material either to guilt or punishment, that is favorable to the accused. Brady v. Maryland, 373 U.S. 83, 87 (1963).  This obligation extends to impeachment evidence and to evidence that was not requested by the defense. United States v. Bagley, 473 U.S. 667, 676, 682 (1985); see also United States v. Agurs, 427 U.S. 97, 107-10 (1976).  To prevail on a Brady claim, a defendant must show that "(1) the evidence was exculpatory or impeaching; (2) it should have been, but was not produced; and (3) the suppressed evidence was material to his

guilt or punishment." United States v. Antonakeas, 255 F.3d 714, 725 (9th Cir.2001) (citing Paradis v. Arave, 130 F.3d 385, 392 (9th Cir.1997)); see Harrison, 316 F.3d at 1065-66. Evidence is "material" for the purpose of a Brady analysis "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987) (citation omitted).  However, "mere speculation about materials in the government's files" does not require a court to make the materials available for a defendant's inspection.  United States v. Michaels, 796 F.2d 1112, 1116 (9th Cir.1986) (quoting United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174, 202 (3d Cir.1970)); see Agurs, 427 U.S. at 109-10 ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

In this case, Petitioner's Pitchess motion failed to provide a sufficient basis for the trial court to be required to grant discovery pursuant to Brady.  Petitioner fails to set forth any evidence with respect to information that might be contained in the officers' personnel files, or that there was a reasonable probability that the trial would have turned out differently had the material evidence been produced.  Accordingly, any argument that this might have been so is merely speculation, which is insufficient to warrant habeas relief.  See Agurs, 427 U.S. at 109-10; see also Ritchie, 480 U.S. at 58 n. 15 (a criminal defendant "may not require the trial court to search through" sensitive records "without first establishing a basis for his claim that [such records] contain[ ] material evidence") (citing United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982) (a criminal defendant "must at least make some plausible showing of how [the evidence sought] would have been both material and favorable to his defense")); see also Harrison, 316 F.3d at 1066 (trial court did not violate petitioner's due process rights in denying motion to discover police officer's personnel file where petitioner "made no showing that ... [the] file contained complaints material to his defense").  Therefore, Petitioner fails to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, clearly established Supreme Court authority.  28 U.S.C. § 2254(d).

///

1       3.    <u>Prosecutorial Misconduct</u>

2       In his third claim for relief, Petitioner makes a vague claim that the prosecutor committed

3 misconduct concerning Officer Dorian's testimony that she recognized Petitioner from "prior

4 contact." (Pet. at 8.)  It appears Petitioner is attempting to challenge the admission of the same

5 evidence at issue in the first claim he raised, but in the context of prosecutorial misconduct.

6       Respondent acknowledges that a claim of prosecutorial misconduct relating to the

7 admission of prior conduct evidence was first presented by habeas petition to the California

8 Supreme Court; however, Respondent argues that the claim as stated is too conclusory to warrant

9 relief.  The Court agrees.

10       The petition presented to the California Supreme Court was summarily denied. (LD 6.)

11 The claim was not presented to any court below.  Therefore, there is no reasoned state court

12 decision.  In such a case, the Supreme Court has stated that "a habeas court must determine what

13 arguments or theories supported . . . or could have supported, the state court's decision; and then

14 it must ask whether it is possible fairminded jurists could disagree that those arguments or

15 theories are inconsistent with the holding in a prior decision of this Court." <u>Harrington</u>, 131 S.Ct

16 at 784.  Petitioner bears the burden of showing that "there was no reasonable basis" for the state

17 court decision. <u>Pinholster</u>, 131 S.Ct. at 1402.

18       A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected

19 the trial with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly</u>

20 <u>v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).  To constitute a due process violation, the

21 prosecutorial misconduct must be "of sufficient significance to result in the denial of the

22 defendant's right to a fair trial." <u>Greer v. Miller</u>, 485 U.S. 756, 765 (1987) (quoting <u>United</u>

23 <u>States v. Bagley</u>, 473 U.S. 667 (1985)).  Any claim of prosecutorial misconduct must be

24 reviewed within the context of the entire trial. <u>Id</u>. at 765-66; <u>United States v. Weitzenhoff</u>, 35

25 F.3d 1275, 1291 (9th Cir. 1994).  The court must keep in mind that "[t]he touchstone of due

26 process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

27 culpability of the prosecutor" and "the aim of due process is not punishment of society for the

28 misdeeds of the prosecutor but avoidance of an unfair trial to the accused." <u>Smith v. Phillips</u>,

455 U.S. 209, 219 (1982). "Improper argument does not, per se, violate a defendant's constitutional rights." Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996) (quoting Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir.1993)). If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Thompson, 74 F.3d at 1577 ("Only if the argument were constitutional error would we have to decide whether the constitutional error was harmless.").

The knowing use of false or perjured testimony against a defendant to obtain a conviction is unconstitutional. Napue v. Illinois, 360 U.S. 264 (1959). In Napue, the Supreme Court held that the knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared. Id. at 269. The Court explained that the principle that a State may not knowingly use false testimony to obtain a conviction-even false testimony that goes only to the credibility of the witness-is "implicit in any concept of ordered liberty." Id. Nevertheless, simple inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted the admission of false testimony. United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.1995). "Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies." Id.

In this case, Petitioner fails to demonstrate that the testimony of Officer Dorian concerning her prior contacts with Petitioner was false, let alone demonstrate that the prosecutor knew it to be false. Respondent correctly argues that the claim is completely conclusory and speculative. James v. Borg, 24 F.3d 20, 26 (9th Cir.1994). The claim must be denied.

4. Exculpatory Evidence

The entirety of Petitioner's claim is: "Petitioner allege that he show that evidence denied him was in fact exculpatory, evidence was material and." (Pet. at 10.) Respondent correctly argues that the claim is conclusory and merely a restatement or further argument of the prior claims. The claim does not warrant review.

///

# IV.

## CERTIFICATE OF APPEALABILITY

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

> (c)     (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

> > (B) the final order in a proceeding under section 2255.

> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Petitioner has not made the required substantial

showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

## V.

## ORDER

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

2) The Clerk of Court is DIRECTED to enter judgment and terminate the case; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **April 1, 2014**

UNITED STATES MAGISTRATE JUDGE